**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHAUNCY RAMONE MARTIN, | ) | CASE NO. 5:22-CV-01679-JRA |
| | ) | |
| Plaintiff, | ) | U.S. DISTRICT JUDGE |
| | ) | JOHN R. ADAMS |
| v. | ) | |
| | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.      INTRODUCTION

Plaintiff Chauncy Ramone Martin ("Mr. Martin") seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner") denying his application for Supplementary Security Income ("SSI"). (ECF Doc. 1). U.S. District Judge John R. Adams has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Civil Rule 72.2, this matter was referred to me for preparation of a Report and Recommendation. For the reasons set forth below, I RECOMMEND that the Court VACATE the Commissioner's decision and REMAND this case for further proceedings consistent with this Report and Recommendation.

## II.     PROCEDURAL HISTORY

On July 9, 2020, Mr. Martin filed an application for SSI, alleging a disability onset date of August 20, 2019. (Tr. 24, 184).[1] This application was denied initially on September 22, 2020, and upon reconsideration on December 29, 2020. (Tr. 121-25, 129-31). Mr. Martin requested a hearing

---

[1] The administrative transcript ("Tr.") is located at ECF Doc. 4 on CM/ECF.

before an administrative law judge ("ALJ"). (Tr. 132). On May 14, 2021, an ALJ held a telephonic hearing due to the COVID-19 pandemic, during which Mr. Martin, represented by counsel, and a vocational expert ("VE") testified. (Tr. 41-70).

On June 22, 2021, the ALJ issued a written decision finding that Mr. Martin was not disabled. (Tr. 24-34). The ALJ's decision became final on July 21, 2022, when the Appeals Council declined further review. (Tr. 1-6). Mr. Martin filed a Complaint on September 20, 2022, challenging the Commissioner's final decision. (ECF Doc. 1). Mr. Martin asserts the following assignments of error:

> (1) The ALJ erred when she failed to adopt the findings of the State Agency reviewing psychologists and find that Martin satisfied Listing 12.04 at Step Three of the Sequential Evaluation.

> (2) The ALJ erred when she failed to find that Martin satisfied the criteria of Listing 8.05 at Step Three of the Sequential Evaluation.

> (3) The ALJ committed harmful error when she failed to properly apply the criteria of Social Security Ruling 16-3p and failed to find that the intensity, persistence and limiting effects of Martin's symptoms precluded him from engaging in substantial gainful activity on a full-time and sustained basis.

(ECF Doc. 6, PageID#796).

## III.    BACKGROUND INFORMATION

### A.  <u>Personal, Educational, and Vocational Experience</u>

Mr. Martin was born in in 1982, and he was 38 years old on the application filing date. (Tr. 33). He lives with his retired mother, and his two minor children visit him on the weekends. (Tr. 46-47). Mr. Martin is a high school graduate and attended college but did not complete his education. (*See* Tr. 48). He did not undergo any further schooling or vocational training. (*Id.*). He has never had a driver's license. (Tr. 47).

### B.  <u>Relevant Hearing Testimony</u>

#### 1.  *Mr. Martin's Testimony*

Mr. Martin testified that the main reason that he cannot work are his psoriasis and eczema. (Tr. 49). He stated that these skin conditions have occurred since childhood. (*Id.*). He testified that when these conditions flare, he "can[not] function as a normal person would" and cannot stop scratching himself. (*Id.*). The skin conditions result in pus and bleeding. (*Id.*). Mr. Martin testified that he does "numerous things" to treat these conditions. (Tr. 50). However, when his condition flares, he reported that he has no option but to go to the emergency room and receive steroids for "heal[ing] up" and reducing  inflammation. (Tr. 50-51). His last visit to the emergency room was approximately three months prior to the administrative hearing. (Tr. 51).

Mr. Martin testified that he received steroids from his primary care provider, which are effective in "heal[ing] it up." (*Id.*). He stated how long his skin remains healed and before his skin conditions flares up varies. (*See id.*). In addition to steroids, Mr. Martin was prescribed Dupixent. (*Id.*). He testified that, at the time of the hearing, it had been eight months since he last used Dupixent due to issues with his insurance "snatch[ing] it away," and – when the medication was reapproved – the specialty pharmacist did not send it to him. (*See* Tr. 51-52). However, Mr. Martin testified that the medication was "working fairly well" during the three months he used it.  (Tr. 52). He also stated that his skin conditions cause him to lose sleep. (*Id.*). He described his experience with his skin conditions as "having a real bad case of poison ivy that just won't let up." (*Id.*).

Mr. Martin testified that he recently started experiencing seizures. (*Id.*). At the time of the hearing, he reported having three seizures since December. (Tr. 53). He takes one and a half tablets

of oxcarbazepine twice a day and Depakote to suppress his seizures. (Tr. 54). Mr. Martin testified that so far these medications have been helping. (*Id.*).

Mr. Martin also testified that he has bipolar depression, which had been "real bad" since his wife left him. (Tr. 55). As a result, Mr. Martin stated that he could not do the things he needed to do, such as washing his clothes. (*Id.*). He stated that he is "just down all the time." (*Id.*). As treatment for Mr. Martin's bipolar depression, his psychiatrist prescribed Rexulti, Depakote, Wellbutrin, and Xanax. (*Id.*). Although Mr. Martin takes these medications, he stated that "they only help so much" and "it's just the situation that…gets [him] down." (*Id.*).

Mr. Martin testified that he has some continuing issues with his clavicle fracture. (Tr. 64). Specifically, he states that "it depends on the weather." (*Id.*). He said that sometimes his clavicle will hurt a "little," but he has not experienced any real issues outside a little discomfort and pain. (*Id.*). He testified that he limits the activities that he does with his right arm. (*Id.*).

Mr. Martin also testified that he has issues with irritability. (*Id.*). He stated that he has mood problems and takes mood stabilizers. (Tr. 64-65). However, ever since his wife left him, Mr. Martin stated that he "get[s] irritable quite bad." (Tr. 65). He testified that his mood problems at times becomes an issue in getting along with others, but he apologizes to them "whenever [he] snap[s] out of it." (Tr. 65). Whether his mood is an issue depends on the occasion and how moody he becomes. (*Id.*).

Mr. Martin testified that he has problems with focus and concentration. (Tr. 65). At the time of the hearing, Mr. Martin was taking Adderall to address these issues, but the Adderall does not work all the time. (*See id.*). He testified that he is able to remember to take his medications on his own "for the most part." (*Id.*).

4

Finally, Mr. Martin testified that he experiences days where he is "so down" that he is unable to complete any tasks around the house. (*See* Tr. 66). He stated that this happens approximately four days a week. (*Id.*). He testified that he does not have any side effects from his medications. (*Id.*).

### 2. *Vocational Expert's Testimony*

The ALJ adopted the past relevant work classification from the prior August 2019 ALJ decision. (Tr. 24). The VE stated that she did not identify any conflicts with adopting the prior decision's work classification. (Tr. 67). The VE testified that Mr. Martin's past relevant work was employment as a material handler. (*Id.*).

The ALJ asked whether a hypothetical individual with Mr. Martin's age, education, and job experience could perform his past relevant work at the light exertional level with the additional limitations that he can frequently handle, finger, or operate hand controls with his bilateral upper extremities; can frequently reach with his left non-dominant upper extremity; can frequently operate foot controls with his bilateral lower extremities; can never climb ladders, ropers, or scaffolds; must avoid all exposure to workplace hazards; can perform simple, routine tasks and make simple workplace decisions; can interact occasionally with supervisors, coworkers, and members of the publics; and can adapt to occasional changes in the work setting or routine. (Tr. 68). The VE opined that this individual could not perform his last relevant work, but this individual could perform work as a housekeeper, merchandise marker, and routing clerk. (*Id.*).

The ALJ then asked whether the individual from the first hypothetical with the additional limitation of never performing tasks at a production rate pace could perform any work. (Tr. 69). The VE opined that the same jobs from the first hypothetical would remain. (*Id.*).

5

The VE stated that the jobs discussed during the hearing would tolerate no more than 10% off task work behavior. (Tr. 70). Based on the VE's work experience and training, the VE additionally opined that employers would typically tolerate no more than two absences per month, including coming in late and leaving early. (*Id.*).

### C. <u>Relevant Medical/Non-Medical Opinion Evidence</u>

#### 1. *State Agency Medical Consultants*

In September 2020, Dr. Leon Hughes, M.D. reviewed the record and agreed with the prior ALJ's decision that Mr. Martin could perform medium work, except Mr. Martin was limited to frequent operation of foot and hand controls and frequent handling and fingering. (Tr. 104-05). In December 2020, Dr. Lynne Torello, M.D. agreed and reached the same findings. (Tr. 113).

#### 2. *State Agency Psychological Consultants*

In September 2020, Dr. Akanksha Dutt, PsyD opined that Mr. Martin had a mild limitation in understanding, remembering, or applying information; moderate limitations in interacting with others and concentrating, persisting, or maintaining pace; and a marked limitation in adapting or managing himself. (Tr. 103). Dr. Dutt explained that Mr. Martin experiences periods of low to high levels of depression and anxiety, which can reasonably be expected to affect his social interactions, ability to focus, and ability to deal with stressors. (*Id.*). Dr. Dutt noted that Mr. Martin is in treatment for these psychiatric concerns and experiences periods of improvement, and that his symptoms are also impacted by situational factors. (*Id.*). Although the diagnoses listed by Mr. Martin's providers have varied, Dr. Dutt stated that Mr. Martin's mental status abnormalities "have consistently supported the MDI established at the time of the ALJ decision." (*Id.*). Thus, Dr. Dutt stated that his findings are "an adoption of the PRTF findings from the ALJ/AC decision dated 08/06/2019 based on [Acquiescence Ruling] 98-4." (*Id.*).

Dr. Dutt also opined that Mr. Martin had the residual functional capacity to perform simple, routine tasks and make simple, work-related decision; is limited to occasional interactions with supervisors, coworkers, and the general public; and can tolerate few changes in a routine work setting. (Tr. 105). He noted that this RFC finding was an adoption of the ALJ's mental RFC finding from a previous decision, pursuant to Acquiescence Ruling 98-4. (*Id.*).

In December 2020, Dr. David Dietz, Ph.D. opined that Mr. Martin had a mild limitation in understanding, remembering, or applying information; marked limitation in interacting with others; and moderate limitations in concentrating, persisting, or maintaining pace and adapting or managing oneself. (Tr. 111). Dr. Dietz also stated that his finding is "an adoption of the PRTF findings from the ALJ/AC decision dated 08/06/2019 based on [Acquiescence Ruling] 98-4." (*Id.*). With respect to Mr. Martin's RFC, Dr. Dietz opined the same limitations as Dr. Dutt. (Tr. 113). Dr. Dietz stated that his RFC finding was "an adoption of the ALJ MRFC signed, which is being adopted under [Acquiescence Ruling 98-4]." (*Id.*).

### D. **Relevant Medical Evidence**

In his SSI application, Mr. Martin alleged disability due to several physical and mental conditions, including, as relevant on appeal, eczema, psoriasis, anxiety, depression, and posttraumatic stress disorder. (Tr. 211). This section includes a summary of the relevant medical evidence to those conditions.

#### 1. *Skin Conditions*

On May 19, 2020 (two months prior to Mr. Martin applying for SSI), Mr. Martin presented to Dr. Morgan Hott, his dermatologist. (Tr. 316). Dr. Hott noted that Mr. Martin had a "decades long history of severe atopic dermatitis" and that several treatments had failed to provide any relief. (*Id.*). At that time, Dr. Hott observed that 50 to 60 percent of Mr. Martin's body was covered with

dermatitis. (*Id.*). Dr. Hott prescribed Dupixent, a prescription biologic medicine used to treat moderate-to-severe atopic dermatitis.[2] (*Id.*).

On October 19, 2020, Mr. Martin had an examination with Dr. Hott. Mr. Martin reported that his dermatitis improved by 70 percent on Dupixent. (Tr. 640). However, Mr. Martin reported that he missed a treatment "because he missed an appointment" and "[s]ince missing his last dose he feels he is quickly declining." (*Id.*). Dr. Hott's physical examination revealed that Mr. Martin had "scattered excoriations" on his trunk and extremities as well as a "very large thicker lichenified plaque" on his right lower extremity. (*Id.*). Dr. Hott indicated that, at the time of the appointment, Mr. Martin had completed three months of Dupixent and "noticed substantial improvement." (*Id.*). Dr. Hott further noted that because Mr. Martin was due for his next Dupixent shot, Mr. Martin was beginning to have recurring itchiness in multiple locations and was "particularly flared" on his right lower extremity. (*Id.*). Dr. Hott advised Mr. Martin to continue taking Clobetasol[3] and Dupixent. (*See id.*).

## 2.  *Other Physical Impairments*

### a.  **Left Collar Bone/Clavicle Fracture**

On November 16, 2020, Mr. Martin broke his left collar bone (clavicle) and then had surgery. (Tr. 754). By March 16, 2021, Mr. Martin reported aggravating factors of lifting, carrying, throwing, and weightbearing. (*Id.*). He also continued to report pain. (*Id.*). However, Mr. Martin's soft tissue swelling had resolved, he had only mild tenderness along the clavicular plate (the plate implanted to treat his broken collar bone), he had no tenderness along the bone, and he was

---

[2] *See* Mayo Clinic, <u>Dupilumab (Subcutaneous Route)</u>, <u>https://www.mayoclinic.org/drugs-supplements/dupilumab-subcutaneous-route/description/drg-20406153</u> (last visited July 7, 2023).

[3] Clobetasol is a corticosteroid topical used to help relieve redness, itching, swelling or other discomfort caused by certain skin conditions. Mayo Clinic, <u>Clobetasol (Topical Application Route)</u>, <u>https://www.mayoclinic.org/drugs-supplements/clobetasol-topical-application-route/proper-use/drg-20073860?p=1</u> (last visited July 7, 2023).

neurovascularly intact. (*Id.*). Post-surgical follow up x-rays of Mr. Martin's left clavicle performed in April 2021 revealed a prior open reduction internal fixation of a midshaft clavicle fracture with a superior plate and screws, the fracture was completely healed and in good alignment, and that there was complete consolidation and bony union. (Tr. 755).

### b. Seizures

On December 20, 2020, Mr. Martin went to the emergency room for a possible seizure. (Tr. 669). His examination and history were not suggestive of seizure, but the emergency provider indicated that his history was "possibly more suggestive" of pseudoseizure (an event that that resembles an epileptic seizure, but which is likely of psychiatric origin).[4] The emergency care provider noted Mr. Martin's discharge problems were seizure-like activity and renal insufficiency. (Tr. 671). The emergency room visit notes indicated that Mr. Martin was already taking an antiseizure medication, Depakote, but this medication was prescribed for a different purpose. (*Id.*).

After Mr. Martin reported a second seizure-like episode to a neurologist, Mr. Martin was started taking an anticonvulsant. (Tr. 743). In January 2021, Mr. Martin obtained an electroencephalogram (EEG)[5] study based on a history of seizures. (Tr. 740). The EEG study was normal and showed no focal slowing or epileptiform activity, but this study did not exclude an epilepsy diagnosis. (*Id.*). At a follow up appointment in January 2021, Mr. Martin reported that he had not had any additional seizures. (Tr. 710). In February 2021, Mr. Martin's MRI obtained an MRI of the brain based on a history of seizures. (Tr. 746). The study revealed cortical blurring along right superior parietal lobule that could reflect a neuronal migrational abnormality

---

[4] *See* National Institutes of Health, Psychogenic Nonepileptic Seizures, https://www.ncbi.nlm.nih.gov/books/NBK441871/#:~:text=Pseudoseizure%20is%20an%20older%20term,but%20are%20of%20psychiatric%20origin (last visited July 7, 2023).
[5] An EEG is one of main diagnostic tests for epilepsy, and it measures electrical activity in the brain using small, metal electrodes attached to the scalp. Mayo Clinic, EEG (electroencephalogram), https://www.mayoclinic.org/tests-procedures/eeg/about/pac-20393875 (last visited July 7, 2023).

contributing to seizures, with the need for correlation with EEG findings. (*Id.*). In February 2021, Mr. Martin told his neurologist that he was unsure whether he had another breakthrough seizure. (Tr. 737).

### c. Gastric Emptying

On July 28, 2020, Mr. Martin had lost over 40 pounds in 12 months. (Tr. 485). He reported weight loss, fatigue, weakness, abdominal pain, redness/rash/hives, depression, sleep disturbances, agitation, and anxiety/excessive worries. (*Id.*). He had previously been diagnosed with delayed gastric emptying on June 29, 2018. (Tr. 486).

On December 12, 2020, Mr. Martin presented to his primary care provider with reports of periodic and sporadic mid-abdominal pain, along with weight loss of 67 pounds over the past 12 months. (Tr. 655). A physical examination performed at this time revealed evidence of significant weight loss, full range of motion in Mr. Martin's extremities, and soft and non-tender abdomen. (*Id.*). Based on those findings and reports, an acute care nurse practitioner diagnosed Mr. Martin with several conditions, including gastric emptying. (Tr. 656). The nurse practitioner further noted that Mr. Martin was doing well with smaller food portions, was able to manage a significant portion of his symptoms with his diet, and previous EGD studies and biopsies were normal. (*Id.*).

### 3. *Mental Impairments*

On March 25, 2020, Mr. Martin told his psychiatrist nurse practitioner, Mr. Robert Parsons, that he had been having difficulties the last two months after his wife left him. (Tr. 335). He reported severely depressed mood and severe anxiety. (*Id.*). On April 20, 2020, Mr. Martin reported high anxiety and depression to his counselor. (Tr. 556). On May 20, 2020, Mr. Martin reported a moderately depressed mood and moderate anxiety. (Tr. 331).

On July 15, 2020, Mr. Martin reported stable mood and being moderately depressed. (Tr. 327). He was in the process of trying to get a divorce. (*Id.*). He did not complain of racing thoughts or report mania episodes. (*Id.*). He was returning to school in two weeks and asked to be restarted on Adderall. (*Id.*). On examination, Mr. Martin was restless, talkative, and anxious, but was casually groomed, made good eye contact, and had normal speech, logical thoughts, good memory and concentration, and fair insight/judgment. (*Id.*).

On September 9, 2020, Mr. Martin again met with Mr. Parsons. (Tr. 540). Mr. Parsons noted that Mr. Martin had "made progress" since his last visit and had "started back to school." (*Id.*). Mr. Martin reported that Adderall helped with Mr. Martin's focus and concentration, his mood had been "stable and mildly depressed," and his anxiety had been "mild in severity." (*Id.*). Mr. Parsons' examination revealed Mr. Martin's mood was anxious and that Mr. Martin was restless and talkative, but his thoughts were logical, his memory was good, and his concentration, insight, and judgment were all fair. (Tr. 541).

After continued counseling to discuss divorcing his wife (Tr. 538), Mr. Martin met with Mr. Parsons again on October 12, 2020. (Tr. 534). He reported severe depression, moderate to severe anxiety, irritability, and racing thoughts. (*Id.*). His mental status examination findings remained the same, including good memory, insight, and judgment, and fair concentration. (Tr. 535). Mr. Parsons adjusted Mr. Martin's medications. (Tr. 537).

On November 4, 2020, Mr. Martin reported stable mood and moderate depression and anxiety. (Tr. 661). Mr. Parsons noted that the combination of Wellbutrin, Rexulti, and Depakote had been effective, and that Trazodone at bedtime was also effective. (*Id.*). Mr. Martin's condition remained unchanged since his last visit. (*Id.*).

On December 7, 2020, Mr. Martin reported moderate depression and mild anxiety. (Tr. 657). Mr. Martin denied mania episodes and reported the combination of Wellbutrin, Rexulti, and Depakote was effective, and that Trazodone at bedtime was also effective. (*Id.*).

## IV.    THE ALJ'S DECISION

In her June 2021 decision, the ALJ found that she was not bound by the residual functional capacity of a prior ALJ decision from August 6, 2019. (Tr. 24). Nevertheless, the ALJ stated that she adopted the mental limitations and some of the non-exertional limitations from the prior decision into the residual functional capacity. (*Id.*). She also stated that she adopted the prior ALJ's findings regarding past relevant work classification. (*Id.*).

The ALJ next determined that Mr. Martin has not engaged in substantial gainful activity since July 9, 2020. (Tr. 26). She further determined that Mr. Martin has the following severe impairments: status post left clavicle fracture with open reduction internal fixation ("ORIF"); seizure disorder; atopic dermatitis/eczema/psoriasis; delayed gastric emptying/unintentional weight loss; bipolar disorder/depressive disorder; generalized anxiety disorder; attention deficit hyperactivity disorder ("ADHD"); and intermittent explosive disorder. (Tr. 26). However, the ALJ found none of these impairments—individually or in combination—met or medically equaled the severity of a listed impairment in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 27).

The ALJ also determined that Mr. Martin could perform light work with the following limitations: frequent handling, fingering, or operating hand controls with his bilateral upper extremities; frequent reaching with his left non-dominant upper extremity; frequent operating of foot controls with his bilateral lower extremities; never climbing ladders, ropes, or scaffolds; avoiding all exposure to workplace hazards such as unprotected heights, moving mechanical parts, or commercial driving; and occasional interaction with supervisors, coworkers, or members of the

public. (Tr. 29). The ALJ also included that Mr. Martin is able to perform simple, routine tasks; make simple workplace decisions; and can adapt to occasional changes in the work setting or routine. (*Id.*).

The ALJ next determined that Mr. Martin is unable to perform any past relevant work. (Tr. 32). She also determined that the transferability of job skills is not material to the determination of disability because using the Medical Vocational Rules as a framework supports a "not disabled" finding regardless of whether Mr. Martin has transferable job skills. (Tr. 33). However, the ALJ determined that, considering Mr. Martin's age, education, work experience, and RFC, that there are jobs that exist in significant numbers in the national economy that Mr. Martin can perform, including a cleaner/housekeeper, merchandise marker, and routing clerk. (Tr. 33-34). Accordingly, the ALJ determined that Mr. Martin was not disabled. (Tr. 34).

## V.      LAW AND ANALYSIS

### A.   <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d

13

234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

**B. <u>Standard for Disability</u>**

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether

14

the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id*.

### C.  Analysis

1. ***The ALJ's Incorrect Assessment of the State Agency Psychologist's Paragraph B Findings Regarding Listing 12.04 Does Not Constitute Scrivener's Error.***

Mr. Martin argues that the ALJ incorrectly assessed the state agency psychological consultants' opinions. (ECF Doc. 6, PageID#802-05). Specifically, he contends that the ALJ should have found marked limitations in Mr. Martin's ability to interact with others and his ability to adapt or manage oneself. (*See id.* at PageID#804). He asserts that the state agency consultants opined that Mr. Martin satisfied the criteria of the Listing. (*Id.* at PageID#805). Specifically, Mr. Martin points out that Dr. Dutt opined that Mr. Martin had a marked limitation in his ability to adapt or manage oneself (Tr. 103), and that Dr. Dietz opined that Mr. Martin had a marked limitation in his ability to interact with others (Tr. 111). Thus, contrary to the ALJ's findings, Mr. Martin contends that he satisfied Listing 12.04's criteria as a result of the opined two marked limitations and should have been found disabled at Step Three. (ECF Doc. 6, PageID#804).

The Commissioner argues that this argument should be rejected because Dr. Dutt's findings included a scrivener's error. (ECF Doc. 7, PageID#822-23). The Commissioner argues that Dr. Dutt, applying Acquiescence Ruling 98-4(6),[6] adopted the ALJ's prior August 2019 RFC findings that Mr. Martin had a mild limitation in understanding, remembering, or applying information; a marked limitation in interacting with others; and moderate limitations in concentrating, persisting, or maintaining pace, and adapting or managing oneself. (Tr. 78-79). Given that Dr. Dutt adopted the prior ALJ's paragraph B findings (*i.e.*, that Mr. Martin had a marked limitation in interacting with others), the Commissioner contends that it is "clear" that Dr. Dutt's finding was a scrivener's error. (ECF Doc. 7, PageID#822). Because Dr. Dutt and Dr. Dietz each found Mr. Martin had only one marked limitation in social functioning, the Commissioner states that Mr. Martin does not meet or equal Listing 12.04. (*Id.* at PageID#823). Mr. Martin responds that the Commissioner's arguments are post-hoc rationale. (ECF Doc. 8, PageID#831-32).

The Commissioner points to no relevant authority directly supporting that the ALJ's misstatement was a scrivener's error. "A scrivener's error is a transcription error or a typographical error." *Hudon v. Astrue*, Civil No. 10-cv-405-JL, 2011 WL 4382145, at *4 (D.N.H. Sept. 20, 2011) (citing *U.S. Nat'l Bank of Ore. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 462 (1993)). Generally, courts in the Sixth Circuit have held that a typographical or scrivener's error is harmless when the ALJ's meaning is clear in context. *Calkins v. Sec'y of Health & Hum. Servs.*, No. 85-5685, 1986 WL 17083, at *2 (6th Cir. May 7, 1986) (unpublished) (holding that the district court properly "examined the opinion as a whole to interpret the true meaning of the ALJ's findings"

---

[6] Acquiescence Ruling 98-46(6) instructs that the agency "must adopt [the residual functional capacity finding] from a final decision by an ALJ or the Appeals Council on the prior claim in determining whether claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding…" AR 98-4(6), 1998 WL 283902, at *3. The Sixth Circuit "appli[es] collateral estoppel to preclude reconsideration by a subsequent ALJ of factual findings that have already been decided by a prior ALJ when there are no changed circumstances requiring review." *Brewster v. Barnhart*, 145 F. App'x 542, 546 (6th Cir. 2005).

and was not required to "ignore the real finding of the ALJ and instead blindly follow the transcriber's version of the finding."); *Barnes v. Comm'r of Soc. Sec.*, No. 16-13714, 2018 WL 1474693, at *8 n.2 (E.D. Mich. Mar. 6, 2018)(finding that scrivener's errors were harmless because "the ALJ's true meaning is easily discernible for the analysis on each topic"); *Duvall v. Comm'r of Soc. Sec.*, No. 2:19-cv-2346, 2020 WL 90750, at *2 (S.D. Ohio Jan. 8, 2020).

But courts have held than even "minimal distinctions" in an ALJ's articulation may require remand. *Rutter v. Comm'r of Soc. Sec.*, No. 3:21-cv-01883-JGC, 2022 WL 4585897, at *12 (N.D. Ohio Sept. 2, 2022), *report and recommendation adopted*, 2022 WL 4585808 (N.D. Ohio Sept. 29, 2022). In *Rutter v. Comm'r of Soc. Sec.*, the claimant argued that the ALJ erred because he failed to provide sufficient explanations for why he failed to include certain limitations, including those opined by a persuasive medical source or described as work-preclusive in VE testimony. *Id.* at *11. The Commissioner countered that the ALJ was not required to incorporate all limitations in the RFC, and that the ALJ provided sufficient explanation for a reviewer to trace the ALJ's reasoning. *Id.* The court determined that the ALJ did not comply with the minimal articulation standards in the ALJ's explanation of the persuasiveness of treating sources. *Id.* at *12. Because the ALJ did not provide any articulation of the state agency medical opinions, the court found that it could not determine if the RFC with respect to the claimant's mental health issues was supported by substantial evidence, or whether the ALJ appropriately considered all medical opinion evidence when forming the mental status RFC. *Id.* at *12-13.

In determining that the ALJ's articulation error was not a mere scrivener's error, the *Rutter* court noted cases where a minimal error merited remand because the court could not determine the ALJ's intent. *See, e.g.*, *Douglas v. Astrue*, No. 1:09-1349-CMC-SVH, 2010 WL 3522298, at *5 (D.S.C. Sept. 3, 2010) (finding it was not a scrivener's error for the ALJ to include a limitation to

SVP 1 and remanding because the court could not determine the ALJ's intent inasmuch as "[n]either the decision nor the record provides sufficient information to determine whether the ALJ … unintentionally omitted 'or 2' from his RFC assessment."). The *Rutter* court determined that, because the ALJ failed to meet the minimum articulation standard, the ALJ's intent was not apparent and the insertion of any corrective language would improperly "lead [the court] to speculate about the ALJ's intent." *Rutter*, 2022 WL 4585897, at *13. Accordingly, the court could not trace the path of the ALJ's reasoning and recommended remand. *Id.*

Like *Rutter*, the ALJ's intent here is not sufficiently apparent to conclude that the ALJ's mistake was merely a scrivener's error. Here, the initial ALJ determined in an August 2019 decision that Mr. Martin had a mild limitation in his ability to understand, remember, and apply information; a marked limitation in his ability to interact with others; and moderate limitations in his abilities to concentrate, persist, and maintain pace and to adapt or manage oneself. (Tr. 78-79).

In her September 2021 decision, the ALJ here noted that she was not bound by the residual functional capacity of the prior ALJ August 2019 decision under Acquiescence Rulings 98-3(6) and 98-4(6). (Tr. 24). The ALJ nevertheless "adopted the mental limitations and some of the non-exertional restrictions from the prior decisions into the residual functional capacity." (*Id.*). The ALJ found persuasive the state agency psychological consultants' mental assessments, who adopted prior ALJ findings and assigned Mr. Martin with "*moderate level mental limitations*." (Tr. 32). Yet, Dr. Dutt in fact opined at the initial level of consideration that Mr. Martin had a *marked limitation* in his ability to adapt or manage oneself. (Tr. 103). And Dr. Dietz opined at the reconsideration level that Mr. Martin had a *marked limitation* in interacting with others. (Tr. 111).

The Commissioner invites the Court to overlook the conflict between the ALJ's decision and the state agency consultants' opinion as a mere scrivener's error, arguing it is "clear" that Dr.

Dutt's finding was that Mr. Martin had a marked limitation in adapting or managing oneself (rather than in interacting with others). (*See* ECF Doc. 7, PageID#822-23). To an extent, this argument could find some support in the record. For example, Dr. Dutt did state, applying Acquiescence Ruling 98-4(6), that he "adopt[ed]" the prior August 2019 ALJ Paragraph B criteria findings. (Tr. 103).

But the ALJ's erroneous statement that Mr. Martin only had "moderate mental limitations" (Tr. 32) is inconsistent with Dr. Dutt's opinion that Mr. Martin had a marked limitation in his ability to adapt or manage oneself (Tr. 103), as well as Dr. Dietz's opinion that he had a marked limitation in interacting with others (Tr. 111). The ALJ does not address this inconsistency in her decision or even mention that the consultants found marked limitations. (*See generally* Tr. 32). Instead, the ALJ broadly described Mr. Martin's mental limitations as "moderate mental limitations." (*Id.*).

This error cannot be described as harmless, as a finding of two marked limitations in the Paragraph B criteria would have compelled a disability finding for Mr. Martin. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04. As stated above, it is general rule that a scrivener's error is a "transcription error or typographical error." *Armata v. Berryhill*, No. 3:17-CV-30054-KAR, 2018 WL 4829180, at *11 (D. Mass. Oct. 4, 2018). Courts, therefore, are "reluctant to apply the scrivener's error doctrine when the apparent contradictions in an ALJ's decisions have the potential to materially affect the disability finding." *Neifert v. Kijakazi*, No. 1:21-CV-1780, 2022 WL 17627869 at *3 (M.D. Pa. Dec. 13, 2022) (denying the Commissioner's motion for reconsideration where finding a scrivener's error to reconcile the ALJ's contradictory RFC findings "would change the outcome of [the] case"). Thus, when the court "is uncertain as to whether [inconsistencies] are mere scrivener's errors as the Commissioner contends, or oversights

19

that could have resulted in a different conclusion," a remand is appropriate. *Raper v. Colvin*, 262 F. Supp. 3d 415, 422 (N.D. Tex. 2017).

Perhaps the inconsistency between the ALJ's findings and the state agency opinions could be resolved by reducing Dr. Dutt's opinion to a mere scrivener's error. But "it is the role of the ALJ, not this Court, to weigh the evidence, resolve significant conflicts in it, and make appropriate determinations based on the evidence presented." *Bradley v. Sec'y of Health & Hum. Servs.*, 862 F.2d 1224, 1227 (6th Cir. 1988). And as stated previously, the finding of two marked limitations would have mandated a finding that Mr. Martin was disabled. *Cf. Nasser v. Comm'r of Soc. Sec.*, 589 F.Supp.3d 614, 626 (E.D. Mich. 2022) (finding scrivener's error in state agency consultant's opinion was harmless where claimant failed to explain how consultant's reference to claimant, who was male, as "she" had prejudicial effect on him). Where the matter is outcome determinative and the ALJ has offered no clear explanation, I am reluctant to "speculate on the ALJ's intent" and characterize the ALJ's statement as a simple scrivener's error. *Rutter*, 2022 WL 4585987, at *12. Accordingly, I recommend that the Court vacate and remand the ALJ's decision to the Commissioner.

Although I recommend remand for the first assignment of error, because this is a Report and Recommendation, I proceed to address the merits of Mr. Martin's remaining assignments of error (*i.e.*, that Mr. Martin's impairments met or medically equaled Listing 8.05 and that the ALJ erred in her SSR 16-3p analysis). I find both assignments of error lack merit.

### 2. *Mr. Martin's Impairments did Not Meet or Medically Equal Listing 8.05.*

Mr. Martin asserts that the ALJ erred by not finding that Mr. Martin satisfied Listing 8.05's criteria. (ECF Doc. 6, PageID#806). Specifically, he contends that despite his medication usage,

there is record evidence demonstrating that he had extensive skin lesions that persisted for at least three months. (*Id.*). The Commissioner disagrees. (ECF Doc. 7, PageID#823-25).

At Step Three, a claimant has the burden to show that he has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant meets all the criteria of a listed impairment, he is disabled; otherwise, the evaluation proceeds to Step Four. 20 C.F.R. § 404.1520(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *see also Rabbers v. Comm'r of Soc. Sec.*, 582 F. 3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing.").

In evaluating whether a claimant meets or equals a listed impairment, an ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (noting that, without such analysis, it is impossible for a reviewing court to determine whether substantial evidence supported the decision). The ALJ "need not discuss listings that the [claimant] clearly does not meet, especially when the claimant does not raise the listing before the ALJ." *See Sheeks v. Comm'r of Soc. Sec.*, 544 F. App'x 639, 641 (6th Cir. 2013). "If, however, the record raises a substantial question as to whether the claimant could qualify as disabled under a listing, the ALJ should discuss that listing." *Id.* at 641; *see also Reynolds*, 424 F. App'x at 415-16 (holding that the ALJ erred by not conducting any Step Three evaluation of the claimant's physical impairments, when the ALJ found that the claimant had the severe impairment of back pain).

"A claimant must do more than point to evidence on which the ALJ could have based his finding to raise a 'substantial question' as to whether he satisfied a listing." *Smith-Johnson v.*

*Comm'r of Soc. Sec.*, 579 F. App'x 426, 432 (6th Cir. 2014) (quoting *Sheeks*, 544 F. App'x at 641-42). "Rather, the claimant must point to specific evidence that demonstrates he reasonably could meet or equal every requirement of the listing." *Id.* (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). "Absent such evidence, the ALJ does not commit reversible error by failing to evaluate a listing at Step Three." *Id.* at 433; *see also Forrest v. Comm'r of Soc. Sec.*, 591 F. App'x 359, 366 (6th Cir. 2014) (finding harmless error when a claimant could not show that he could reasonably meet or equal a listing's criteria).

Listing 8.05 provides that dermatitis (*e.g.*, psoriasis and atopic dermatitis) with "extensive skin lesions" that persist for at least three months despite continuing treatment as prescribed constitutes a disability. 20 C.F.R. § 404, Subpt. P, App. 1, § 8.05. "Extensive skin lesions" are defined as "those that involve multiple body sites or critical body areas, and result in a very serious limitation." 20 C.F.R. § 404, Subpt. P., App. 1, § 8.00(C)(1). Examples of extensive skin lesions that result in a very serious limitation include but are not limited to:

> a. Skin lesions that interfere with the motion of your joints and that very seriously limit your use of more than one extremity; that is, two upper extremities, two lower extremities, or one upper and one lower extremity.

> b. Skin lesions on the palms of both hands that very seriously limit your ability to do fine and gross motor movements.

> c. Skin lesions on the soles of both feet, the perineum, or both inguinal areas that very seriously limit your ability to ambulate.

*Id.*

Here, Mr. Martin fails to meet Listing 8.05 because he does not demonstrate that these skin lesions persisted for approximately three months. In support of his argument, Mr. Martin argues that Dr. Hott "indicated [Mr. Martin] had a long history of severe atopic dermatitis, which was severely itchy at times and covered 50 to 60% of his body surface." (ECF Doc. 6, PageID#806).

22

Reliance on this evidence is misplaced, however, because it is outside the relevant period. Indeed, Dr. Hott's note occurred in May 2020, two months prior to Mr. Martin filing for SSI and two months prior to his alleged disability onset date. (Tr. 24). And the only evidence within the relevant time period that Mr. Martin points to is Dr. Hott's October 2020 dermatology note. As Mr. Martin correctly states, Dr. Hott reported in October 2020 that Mr. Martin had scattered excoriations on his trunk and extremities with a flare on his right lower extremities. (Tr. 640). Yet, this same dermatology note included reports from Mr. Martin that he had 70 percent improvement in dermatitis from taking Dupixent, but he had increased symptoms after missing a dose of this medication. (*See id.*). Here, it is unclear—and Mr. Martin does not elaborate—how "scattered excoriations" when Mr. Martin misses a dose of Dupixent qualifies as "extensive skin lesions … despite continuing treatment as prescribed." 20 C.F.R. § 404, Subpt. P, App. 1, § 8.05. Thus, Mr. Martin fails to demonstrate any lesions that persisted over the course of three months. *Saliba v. Comm'r of Soc. Sec.*, No. 1:21-CV-1908, 2022 WL 18811452, at *11 (N.D. Ohio Nov. 3, 2022), *report and recommendation adopted*, 2023 WL 2139372 (N.D. Ohio Feb. 21, 2023) (finding that claimant failed to demonstrate that she met Listing 8.05's requirements because medical records did not demonstrate any lesions that persisted over the course of three months).

Mr. Martin asserts an additional, cursory argument: that the ALJ failed to explain how she accounted for Mr. Martin's eczema in formulating the RFC.[7] (ECF Doc. 6, PageID#806). Yet, this argument overlooks the ALJ's RFC analysis regarding Mr. Martin's skin conditions. Specifically, the ALJ concluded that "there are no indications in the medical record of limitations beyond the performance of light level work with the non-exertional restrictions listed above." (Tr. 31). In

---

[7] It is well-settled that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997); *Hough v. Comm'r of Soc. Sec.*, No. 12-14678, 2014 WL 764634, at *9 (E.D. Mich. Feb. 25, 2014) (relying on *McPherson* when noting claimant did not sufficiently present her claimed errors).

considering Mr. Martin's skin conditions, she specifically stated that Mr. Martin's dermatitis has been well-managed by his medication. (*Id.*). And this assertion is supported by substantial evidence. Indeed, as noted by the ALJ earlier in the decision (*id.*), Mr. Martin reported 70 percent improvement in his dermatitis from taking Dupixent, despite his increased symptoms after missing his dose. (Tr. 640). While Mr. Martin disagrees with the ALJ's finding, he points to no evidence demonstrating greater limitations from his dermatitis.

To the extent that Mr. Martin attempts to use his dermatitis diagnosis as evidence of his limitations (*see* ECF Doc. 6, PageID#806), such an argument fails. It is well-established that a diagnosis does not establish the severity of a condition, or the functional limitations caused by the condition. *See Despins v. Comm'r of Soc. Sec.*, 257 F. App'x 923, 930 (6th Cir. 2007) ("The mere existence of…impairments…does not establish that [the claimant] was significantly limited from performing basic work activities for a continuous period of time."); *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1998) ("[M]ere diagnosis of arthritis … says nothing about the severity of the condition."); *Baker v. Colvin*, No. 1:15-CV-00910, 2016 WL 4128435, at *13 (N.D. Ohio Aug. 3, 2016).

Thus, the ALJ properly determined that Mr. Martin's conditions did not meet or medically equal Listing 8.05 and reached reasonable findings supported by substantial evidence. 42 U.S.C. §405(g); *Rogers*, 486 F.3d at 241. Accordingly, I recommend that the Court reject this assignment of error because it lacks merit.

### 3. *Substantial Evidence Supports the ALJ's Conclusion that Mr. Martin's Subjective Complaints were Inconsistent with the Record.*

Mr. Martin also argues that the ALJ erred because she failed to properly apply SSR 16-3p's criteria and failed to find that the intensity, persistence, and limiting effects of Mr. Martin's symptoms precluded him from engaging in substantial gainful activity on a full-time and sustained

24

basis. (ECF Doc. 6, PageID#807-11). Specifically, Mr. Martin asserts that the medical evidence supported his hearing testimony regarding the intensity, persistence, and limiting effects of his symptoms. (*Id.* at PageID#808-10). He also argues that the ALJ "failed to articulate any supportable rationale" for finding that Mr. Martin's statements and the evidence did not support a conclusion that he would be precluded from all types of work. (*Id.* at PageID#810 (citing Tr. 30)). This assignment of error lacks merit because the ALJ articulated reasons and provided substantial evidence in support of those reasons in discounting Mr. Martin's subjective symptoms.

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms. *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989). An ALJ is not required to accept a claimant's subjective symptom complaints, however, and may properly discount the claimant's testimony about a claimant's symptoms when it is inconsistent with objective medical and other evidence. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475-76 (6th Cir. 2003); SSR 16-3p, 2016 SSR LEXIS 4 *15 (Oct. 25, 2017) ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence."). In evaluating a claimant's subjective symptom complaints, an ALJ may consider several factors, including the claimant's daily activities, the nature of the claimant's symptoms, the claimant's efforts to alleviate his symptoms, the type and efficacy of any treatment, and any other factors concerning the claimant's functional limitations and restrictions. SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible).

Although the ALJ should consider the entire record, there is no requirement that the ALJ discuss every factor that was considered in reaching her conclusion or provide a factor-by-factor analysis. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009); *see also Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 733 (N.D. Ohio 2005) ("The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence."). However, "[i]n evaluating an individual's symptoms, it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statement about the individual's symptoms are (or are not) supported or consistent.'" SSR 16-3p, 2016 WL 1119029, at *9. Rather, an ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.*; *see also Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) ("If an ALJ rejects a claimant's testimony as incredible, [s]he must clearly state [her] reason for doing so."). On review, courts must "accord the ALJ's determination of credibility great weight and deference particularly since the ALJ as the opportunity, which [the courts] do not, of observing a witness's demeanor while testifying." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) (citations omitted).

A review of the ALJ's decision reveals the ALJ offered discernible, valid reasons for discounting Mr. Martin's subjective symptoms. For example, the ALJ discussed the effectiveness of treatment when discounting Mr. Martin's subjective symptoms. 20 C.F.R. § 416.929(c)(3)(iv) (factor that an ALJ may consider is the effectiveness of treatment). With respect to Mr. Martin's claims regarding his skin conditions, a shoulder fracture, and seizures, the ALJ observed that Mr.

Martin saw "significant improvement." (Tr. 31). The ALJ noted that while delays in receiving Mr. Martin's dermatitis medications due to insurance and other issues prolonged his symptoms, Mr. Martin's dermatitis was well-managed by those medications. Indeed, as noted by the ALJ earlier in her decision, Mr. Martin had "70 percent improvement in dermatitis from taking Dupixent." (Tr. 30; *see* Tr. 640). The ALJ also observed that while Mr. Martin had lost weight and was diagnosed with delayed gastric emptying, Mr. Martin was "doing very well with smaller portions" and he was "able to manage a significant portion of his symptoms with diet." (Tr. 30; *see* Tr. 656).

In noting that Mr. Martin's mental health allegations were inconsistent with the record evidence, the ALJ observed that Mr. Martin experienced "significant improvement in his symptoms from his psychotropic medication and counseling sessions." (Tr. 31). And elsewhere in the decision, the ALJ provided substantial evidence to support this conclusion. Significantly, the ALJ observed that Mr. Martin's December 2020 treating notes indicate Mr. Martin had mild anxiety, denied any mania episodes, and reported Trazadone (an antidepressant) was helpful at bedtime. (Tr. 31; *see* Tr. 657). A mental status examination performed at this time revealed Mr. Martin had anxious mood and fair judgment and concentration. (Tr. 31; *see* Tr. 658). He was diagnosed with generalized anxiety disorder and bipolar disorder. (Tr. 41; *see* Tr. 657). Through discussing the effectiveness of Mr. Martin's treatment, the ALJ also considered the conflicts between Mr. Martin's statements and the objective medical evidence, which SSR 16-3p calls for the ALJ to do. 20 C.F.R. § 416.929(c)(4) ("[The ALJ] will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence, including [the claimant's] history, the signs and laboratory findings, and statement by [the claimant's] medical sources or other persons about how [the claimant's] symptoms affect [the claimant].")

The ALJ also noted that several of Mr. Martin's mental health problems were the result of situational stressors. (Tr. 31). This conclusion finds support from the ALJ's cited records as there are multiple mentions of Mr. Martin's psychosocial stressors such as family and marital problems. (*See, e.g.*, Tr. 442, 450, 454, 462, 466, 534, 538, 552, 554, 558, 665).  Mr. Martin fails to establish how this was an invalid assessment.

To the extent that Mr. Martin attempts to rely on the ALJ's Paragraph B findings—or the state agency consultants' inconsistent opinions—to demonstrate that the ALJ failed to include appropriate limitations for his subjective symptoms in her mental RFC findings, such an argument fails. (*See generally* ECF Doc. 6, PageID#802-05). An ALJ's Paragraph B findings are irrelevant to an ALJ's RFC finding. Paragraph B limitations "are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3." SSR 96-8p, 1996 WL 374184, at *4. Even if the ALJ erred in stating her Paragraph B findings, the ALJ's RFC appears to be consistent with the state agency prior administrative medical findings. Both Dr. Dutt and Dr. Dietz found that Mr. Martin could perform simple, routine tasks and make simple work-related decisions; was limited to occasional interactions with supervisors, coworkers, and the general public; and tolerated few changes in a routine work setting. (Tr. 105, 113). This is consistent with the ALJ's RFC finding that Mr. Martin could "perform simple, routine tasks and make simple workplace decisions; … interact occasionally with supervisors, coworkers, or members of the public; and … adapt to occasional changes in the work setting or routine." (Tr. 29).

Mr. Martin summarizes his hearing testimony, written statements, and multiple medical records to argue that he had a combination of symptoms that limit his ability to function and complete his activities of daily living. (ECF Doc. 6, PageID#807-10). However, he fails to directly challenge any of the reasons presented by the ALJ. (*See generally id.*). The presence of some

evidence that supports a claimant's position is not, alone, a sufficient reason for a remand. So long as the ALJ's decision is supported by substantial evidence, courts "must defer to that decision 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Collins v. Comm'r of Soc. Sec.*, 357 F. App'x 663, 667 (6th Cir. 2009) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). As demonstrated above, the ALJ provided substantial evidence to support her decision. Moreover, the ALJ provided an adequate explanation of her reasoning for discounting Mr. Martin's subjective symptoms. This explanation was adequate "to allow the appellate court to trace the path of [her] reasoning." *Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011) (quoting *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995)). Thus, I find that Mr. Martin' s arguments lack merit and recommend that the Court reject this assignment of error.

## VI.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court VACATE the Commissioner's final decision and REMAND this case for further proceedings consistent with this Report and Recommendation.

Dated: July 11, 2023

_s/ Jennifer Dowdell Armstrong_
Jennifer Dowdell Armstrong
U.S. Magistrate Judge

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

**Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the

basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).